762 So.2d 1081 (2000)
LOUISIANA HOUSEHOLD GOODS CARRIERS, a Domestic Unincorporated Association, by and through William D. Hathorn, its President; Northlake Moving and Storage Inc., individually and as a Member of Louisiana Household Goods Carriers Association; A-1 Movers, Inc., individually and as a Member of Louisiana Household Goods Carriers Association; and Hathorn Moving and Storage Co., Inc., individually and as a Member of Louisiana Household Goods Carriers Association
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 99-CA-3184.
Supreme Court of Louisiana.
June 30, 2000.
*1084 Janet S. Boles, Boles, Boles & Ryan, Baton Rouge, Counsel for Applicant.
Eve Kahao Gonzalez, Baton Rouge, Stephen Kenneth Conroy, Christine Wendt Marks, Montairie, Counsel for Respondent.
KIMBALL, Justice.[*]
This appeal raises the issue of whether the Louisiana Public Service Commission (Commission) erred in granting a common carrier certificate to Pontchartrain Movers, Inc. (Pontchartrain) that authorized the transportation of household goods within a 150 mile radius of Covington, Louisiana. On appeal to the Nineteenth Judicial District Court, pursuant to La. R.S. 45:1192, the Commission's order was affirmed. Protestants appeal directly to this court pursuant to Article IV, § 21 of the Louisiana Constitution of 1974. After reviewing the record of the evidence in this case and the law, we conclude that the Commission's finding that Pontchartrain met the burden of showing public necessity and convenience in its application for a common carrier certificate was not arbitrary and capricious and is reasonably supported by the evidence. Thus, the trial court's judgment is affirmed.

FACTS
Pontchartrain filed an application for a common carrier certificate authorizing the transportation of household goods within a 150 mile radius of Covington, Louisiana on February 7, 1997, which was published in the Commission's bulletin of February 21, 1997. During the 25-day publication period, opposition was filed by the Louisiana Household Goods Carriers Association (Association) and its member carriers. Protestants are certified carriers holding certificates of public convenience and necessity for transporting household goods statewide. A hearing was held on June 17, 1997, by Administrative Law Judge John Chrisman (ALJ) involving 13 witnesses and 17 exhibits. The ALJ took the matter under advisement and issued a proposed recommendation finding that Pontchartrain had met its burden of proving public necessity and convenience required under La. R.S. 45:164 on July 2, 1997. On August 20, 1997, after a public hearing[1] and upon the final recommendation of the ALJ, the Commission issued Common Carrier Certificate No. 6261 (certificate) to Pontchartrain pursuant to Order No. T-22305. Protestants appealed the order to Judge Janice Clark, of the Nineteenth Judicial District, pursuant to La. R.S. 45:1192, who affirmed the issuance of the certificate on August 25, 1999.

LAW AND DISCUSSION
Protestants contend that the Commission abused its authority in granting the certificate in this instance in that there was no showing of public convenience and necessity that warranted the grant to applicant of authority to transport household goods within a 150 mile radius of Covington, Louisiana.
La. R.S. 45:164 governs the issuance of common carrier certificates by the Commission. Section A of that statute provides, in pertinent part:
[N]o motor carrier shall operate as a common carrier without first having obtained from the commission a certificate of public convenience and necessity, which shall be issued only after a written application made and filed, a public hearing, due notice given to applicant and all competing common carriers, and a finding by the commission that public *1085 convenience and necessity require the issuance of a certificate. No new or additional certificate shall be granted over a route where there is an existing certificate, unless it be clearly shown that the public convenience and necessity would be materially promoted thereby.
Thus, in order for a motor carrier to operate as a common carrier under Louisiana law, it must obtain a certificate of public convenience and necessity from the Commission. The Commission will issue such a certificate only after giving notice to competing carriers, holding a public hearing and determining that the public convenience and necessity (PC & N) require the certificate be issued. La. R.S. 45:164; Matlack, Inc. v. Louisiana Pub. Serv. Comm'n, 622 So.2d 640, 649 (La. 1993). Further, if the Commission has previously issued a certificate to another carrier to conduct the same operation, the applicant has the burden of clearly showing that the PC & N would be materially promoted by its issuance. Id. (citing L & B Transport Co. v. Louisiana Pub. Serv. Comm'n, 602 So.2d 712, 714 (La.1992)).
PC & N is a dynamic and flexible concept, which is not susceptible to a rigid or precise definition; thus, it must be determined on a case-by-case basis. Matlack, 622 So.2d at 650, (citing Florane v. Louisiana Pub. Serv. Comm'n, 433 So.2d 120, 123 (La.1983)). Evaluating whether an applicant has met the requisite burden of proving PC & N under La. R.S. 45:164 is a matter within the Commission's sound judgment and discretion. Mississippi Chemical Exp., Inc. v. Louisiana Pub. Serv. Comm'n, 94-0440 p. 7 (La.5/23/94), 637 So.2d 93, 98. The Commission's determination of PC & N is an exercise of its discretionary authority, which is therefore accorded great weight. Id. (citing Florane, 433 So.2d at 123; and Dreher Contracting & Equipment Rental, Inc. v. Louisiana Pub. Serv. Comm'n, 396 So.2d 1265, 1267 (La.1981)). Such determinations by the Commission have a presumption of validity and the party attacking the determination has the burden of proving its invalidity. Id. (citing Louisiana Oilfield Carriers Ass'n v. Louisiana Pub. Serv. Comm'n, 281 So.2d 698, 700 (La.1973)).
Upon judicial review, a court will not overturn the Commission's determination of PC & N unless it is based on an error of law, or if it is arbitrary and capricious. Id. (citing Miller Transporters, Inc. v. Louisiana Pub. Serv. Comm'n, 518 So.2d 1018, 1020 (La.1988) (collecting cases); and Matlack, 622 So.2d at 650 (collecting cases)). Thus, a "Commission's Order should be upheld unless it is arbitrary and capricious or a clear abuse of power." Herman Brothers, Inc. v. Louisiana Pub. Serv. Comm'n, 564 So.2d 294, 297 (La.1990) (collecting cases). A determination by the Commission "is arbitrary and capricious only when the evidence in the record does not and could not reasonably support it." Mississippi Chemical Exp., 94-0440 p. 7-8, 637 So.2d at 98.
Therefore, when reviewing the Commission's determination, it is not the role of the reviewing court to re-weigh the evidence, to re-judge the credibility of the witnesses or to substitute its findings for those of the Commission. Id. at 99 (citing Southern Message Serv., Inc. v. Louisiana Pub. Serv. Comm'n, 554 So.2d 47, 56 (La. 1989); and B & M Trucking, Inc. v. Louisiana Pub. Serv. Comm'n, 353 So.2d 1323, 1328 (La.1977)). Thus, reasonable inferences of fact and of credibility by the Commission should not be overturned upon review, even though the court may feel its own evaluations are as reasonable. Id. (citing Southern Message Serv., 554 So.2d at 56); see B & M Trucking, 353 So.2d at 1328 (noting that the case might have been decided differently, but declining to substitute court's judgment for Commission's). More concisely, the court's role in judicially reviewing the Commission's "determination of PC & N is quite narrow: if the determination is reasonably supported by the evidence in the *1086 record, [the court] must affirm." Mississippi Chemical Exp., 94-0440 p. 8, 637 So.2d at 99 (citing Scotty's Vacuum Serv., Inc. v. Louisiana Pub. Serv. Comm'n, 450 So.2d 1303, 1304 (La.1984); and B & M Trucking, 353 So.2d at 1326-27).
Thus, in this case, the court must determine whether the Commission, acting reasonably on the evidence before it, could have determined that issuing Pontchartrain a common carrier certificate, which gave it the authority for the transportation of household goods within a 150 mile radius of Covington, Louisiana, would materially promote the PC & N and, correspondingly, whether the district court judge erred in affirming the Commission's determination.
In order to determine whether the Commission's order is reasonably supported by the evidence, a comprehensive review of the testimony presented at the hearing before the ALJ is necessary. Ken-Go Servs. Inc. v. Louisiana Pub. Serv. Comm'n, 483 So.2d 141, 143 (La.1986). At the June 17, 1997, hearing Pontchartrain's first witness was Emerson Sims (Sims), Pontchartrain's president and fifty-one percent owner. Sims testified that he is a certified public mover and had many years experience as a mover for a company specializing in moving pianos before starting Pontchartrain in 1994, which was incorporated in 1995. Sims testified about the specialized techniques he uses to move pianos properly and presented photographs of himself and his brother moving a piano to illustrate his points. He estimated that they currently move 10-30 pianos a month, which requires specialized equipment and handling. They currently operate within the ten miles of Covington, but seek authority to make moves within 150 miles of Covington. He believes that there is a demand for his services, with his company receiving calls for service to and from Slidell, Metairie, Hammond, Baton Rouge, Bogalusa, Franklinton, and both south and north shores of the lake. He also testified that his company does blanket moving, which enables the moving of fine furniture and antiques without harm. He and his brother actually make the moves themselves, along with three other full-time employees. The company owns one truck, a bobtail that is twenty-four feet long, with the company logo, and rents an additional truck as needed. Sims testified he planned to purchase a second truck in the coming months. His company is not affiliated with other movers and is only interested in intrastate moves, not interstate moves. In a month's time, he receives approximately thirty to sixty calls for services and performs approximately thirty to forty jobs per month. He has had to turn down approximately forty jobs in the last two weeks, those jobs being outside the ten mile radius of Covington. He refers some of these calls to Northlake Moving. From January to June 1997, he has turned down approximately 300 jobs because he did not have to authority to service these customers. He believes his company offers the public honest, clean-cut and hardworking movers, as well as competitive pricing and availability. Although he has had to turn down moves when he has been booked, this is a rare occurrence and he can usually perform a same-day move.
Sims further testified that the peak season for the moving industry is from May to October and he sees an unfilled need in the Covington and surrounding areas for moves during these time periods. He feels that due to the rapid expansion of the area, with a large number of people moving away from New Orleans, this need for movers will continue to increase. He contacted the Department of Voters and Registration and learned that on May 5, 1990, 70,998 registered voters resided in St. Tammany Parish, and that on May 9, 1997, 105,221 registered voters resided in the parish. Documentation from the Department of Voters and Registration was entered into evidence that supported those numbers. A pamphlet produced by the St. Tammany Parish Policy Jury was also entered *1087 into evidence, which stated, in pertinent part:
St. Tammany is the fastest growing Parish in Louisiana and in the southeastern part of the United States for the past two decades. Between the 1980 and 1990 Census, the Parish population has increased by more than 33%. At present, over 173,000 people reside in St. Tammany. The population has grown from 26,988 in 1950 to over 175,000 in 1996. The growth averages about 500 to 600 people per month, translating into 3,000 to 4,000 new homes per year being built.
Sims testified that he believed this documentary evidence shows that people from other locations outside of Covington need the services of moving companies to move into the area. He feels that a grant of this authority would be in the public interest and would not adversely affect current certified movers, with only Northlake Moving being located in Covington. He conceded that other than his company, approximately nine to fourteen other movers are listed in the St. Tammany Yellow Pages. His company also performs other moving related services that are not regulated by the Commission, such as moving business offices, industrial locations and the like.
Pontchartrain's second witness was its vice president, William Kevin Sims. Kevin Sims testified that he owns forty-nine percent of the business as co-owner with his brother. Kevin Sims received a bachelors and master's degree from LSU in accounting and is a CPA. He began working for Nichols Moving with his brother when he had trouble getting a job after graduation. He joined Pontchartrain when it started in 1995 as a joint family venture. Kevin Sims is responsible for the financial operations of the company as well as being involved in the booking, packing and actual moving of customers.
Kevin Sims testified that he had conducted an informal survey of the certified movers in Louisiana. He first obtained a list of certificated household goods movers from the Commission, which had a total of eighty-seven carriers listed. After eliminating all carriers outside the 150 mile radius of this application, only fifty-five carriers remained. He then called all of these carriers personally over a five day period. From these calls, he was able to determine that six were not active and twenty-two did not move household goods, which left twenty-seven companies remaining as competitors with Pontchartrain. Of these, seven did not perform local moves during the peak moving season (from May to October) and the others have rates that vary depending on the time of year and month a person moves.[2] He presented the ALJ with his handwritten notes from his survey and provided telephone records to show the calls were made. Kevin Sims further testified as to the liability, cargo and workers' compensation insurance carried by Pontchartrain. He believes his company provides a unique and special service to the moving public in that they will make any type and size move, no matter how small. Also, they are more convenient for customers on the north shore and, because they have no interstate business, can devote more time and energy to local moves within the 150 mile radius of Covington.
Pontchartrain presented five supporting shipper witnesses at the hearing. The first supporting shipper witness was Helen St. Romain. Ms. St. Romain testified that she had used Pontchartrain in May 1997. The move involved special circumstances and she was very pleased with the very professional and efficient work done by Pontchartrain and the movers did not damage any of her furniture. She recommends them to her friends and would like to use them again when she moves into her new house, which would be outside their current authority.
The second supporting shipper witness was Stephanie Robertson. She used *1088 Pontchartrain to move a large, cast-iron bed from one room of her house to another. Pontchartrain was available within the hour in which she called. She plans to change residences in six months from the time of the hearing and would like to use them as she feels they provide a professional, dependable service.
The third supporting shipper witness was Greg Maxwell. Mr. Maxwell testified that he had used Pontchartrain for a move and had recommended them to friends. He had intended to move himself, but hurt his back. He called Pontchartrain and they were able to move him on short notice. He was very happy with the service provided by Pontchartrain and would like to use them when he moves to Folsom in the coming year.
The fourth supporting shipper witness was Tonya McAvoy. Ms. McAvoy testified that she needed movers for a last minute move. She called two moving companies on a Friday afternoon, neither of which responded. She then called Pontchartrain, which was willing to accommodate her by moving her at 6:00 a.m. the next day. She testified that she would use Pontchartrain again in any future moves and would gladly recommend them to friends.
The fifth supporting shipper witness was Vikki Leftwich. Ms. Leftwich testified that she owns three furniture stores, one located in Baton Rouge, one in Covington and one in New Orleans. She needs a moving service to deliver furniture she sells to her customers' homes. She has used, and will continue to use, Pontchartrain for these services because of the quality of their work and because they are a "blanket mover," which means that all of the furniture is wrapped in moving blankets before being moved. She was not aware that these types of moves are not under the Commission's jurisdiction. She has, however, used them to move her own household goods three times in the last three years and gladly refers Pontchartrain to all her customers who ask her for a reference. She testified that she uses Pontchartrain because of their professional service and feels that, in her experience, no other blanket carriers are available. She testified that other general freight carriers she used in the past damaged the furniture, while Pontchartrain has never damaged any of her furniture. The only other carrier she would consider using is Kid Gloves in New Orleans, but they are extremely expensive and rarely available. She testified that she feels there is a need for a mover located on the north shore because, in her experience, it is less costly to use a local mover rather than have one come in from outside the area.
Pontchartrain's final witness was Rick Roberts, a real estate broker in Mandeville. He testified that the population on the north shore in not only growing at a huge rate, but he feels this trend will continue in the future based on the number of homes being sold in the Covington/Mandeville area. Further, he gave his opinion that the documentary evidence submitted by Pontchartrain concerning the population growth in St. Tammany Parish was accurate.
Testimony was presented at the hearing from the following Protestants/carriers: Howard Taylor, owner, A-1 Movers, Inc., Baton Rouge; Carol Lulich, owner, Lee Moving & Storage, New Orleans; Peter Weil, owner, Associated Moving & Storage, Baton Rouge; Rick Paulk, president, Paulk's Moving & Storage, Harahan; and Larry Terrell, president, Northlake Moving & Storage, Inc., Covington. All of the Protestants/carriers hold statewide household goods authority, are affiliated with different national moving companies and all presented similar testimony. All testified that there is no need for another certified mover in the area as the current certified movers are able to handle the business. All testified that they felt the grant of this authority to Pontchartrain would adversely affect their companies and divert business from other certificated movers. All testified that they believed *1089 the moving business has been decreasing and that, at times, they have a twenty to thirty percent underutilization of their equipment. However, during the peak moving season, all testified they had near 100 to 100 percent utilization of their equipment. Further, only five to ten percent of each's business comes from intrastate moves, with the vast majority of their business coming from the more profitable interstate moves.
As an initial matter, Protestants raise issues concerning the competency of the evidence presented by Pontchartrain to establish PC & N. First, Protestants contend that the testimony of the five witnesses who have used Pontchartrain's services is irrelevant to prove PC & N because the moves testified to were within the local area, or otherwise exempt. Thus, because none of these moves involved household goods outside of the exempt zone under which Pontchartrain has been legally operating and do not require certification, Protestants aver that this testimony should not be considered. Second, Protestants raise objections to the admission of Kevin Sims' survey as hearsay, which should neither have been admitted nor considered.
Administrative bodies are usually not bound by the technical rules of evidence. See Chaisson v. Cajun Bag & Supply Co. 97-1225 (La.3/4/98), 708 So.2d 375. La. R.S. 45:163.1 grants the La. Public Service Commission the authority "to enact such rules and modes of procedure, enforcement, and penalties as may be necessary or appropriate for the Louisiana Public Service Commission to take advantage of the provisions of Public Law 89-170 (49 U.S.C. § 302(b)) Motor Carrier Standards (49 Code of Federal Regulations, Part 1023), and to charge such fees as may be permitted thereunder." Rule 32 of the "Rules of Practice and Procedure of the Louisiana Public Service Commission" states:
Any evidence which would be admissible under the general statutes of the State of Louisiana, or under the rules of evidence governing proceedings in matters not involving a trial by jury in the Courts of the State of Louisiana, shall be admissible before the Louisiana Public Service Commission. Other evidence may be admitted by the Commission if it is at all probative and relevant provided the substantive rights of all parties are protected. The rules of evidence shall be applied liberally in any proceeding to the end that all needful and proper evidence shall be conveniently, inexpensively and speedily heard while preserving the substantive rights of the parties to the proceeding.
Thus, the Commission has broad discretion to admit evidence that would not be admissible in a judicial proceeding. However, this discretion is not unlimited, as the evidence relied on must be probative and relevant, or, in other words, competent. This court has held that competent evidence must have "some degree of reliability and trustworthiness, notwithstanding that the evidence might fall outside of the technical rules for admissibility." Chaisson v. Cajun Bag & Supply Co., 97-1225 p. 10, 708 So.2d at 381. The testimony of Pontchartrain's five shipper witness cannot be deemed inadmissible under the liberal rules of the Commission as the evidence has probative value as to the carriage operations conducted by Pontchartrain. Further, because their testimony has "some degree of reliability and trustworthiness," the testimony cannot be deemed incompetent. Thus, the Commission was entitled to consider this evidence when it determined whether to grant the certificate to Pontchartrain.
As to Protestants' second contention, hearsay is defined as "a statement, other than the one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.Code Evid. art. 801(C). The survey, then, is clearly hearsay and Protestants *1090 objected to it as such at the hearing when it was sought to be introduced. This court has held, in the context of administrative proceedings, that hearsay evidence can qualify as competent evidence. Chaisson, 97-1225 p. 10, 708 So.2d at 381. In Chaisson, this court held that the "general rule in administrative hearings is to allow hear: say evidence and to recognize that the inability to cross-examine the declarant affects the weight that the evidence carries." 97-1225 p. 11, 708 So.2d at 382 (citing McCormick On Evidence § 352 (4th ed.1992)). Thus, to give effect to the more relaxed evidentiary standards in administrative hearings, hearing officers have the discretion to admit hearsay evidence in workers' compensation proceedings. Id. By the same token, the ALJ has discretion to admit hearsay evidence in Commission hearings to allow the Commission to give what weight it will to such evidence. Hearsay evidence "can qualify as `competent evidence,' provided that the evidence has some degree of reliability and trustworthiness and is of the type that reasonable persons would rely upon. This determination must be made on a case-by-case basis under the particular facts and circumstances. The reviewing court must evaluate the competency of the evidence under the manifest error standard." Chaisson, 97-1225 p. 12-13, 708 So.2d at 382.
However, this court further held that if the evidence admitted is deemed incompetent, the admission of such evidence is not error per se, as the Legislature has granted hearing officers the discretion to disregard such admitted, but incompetent evidence, in reaching his factual findings. Chaisson, 97-1225 p. 14, 708 So.2d at 383. Thus, when a reviewing court finds incompetent evidence in the record, it must apply a manifest error standard of review, unless it is clear from the written or oral reasons for judgment or otherwise evident from the record, that the administrative authority actually relied upon the incompetent evidence in arriving at its factual findings. Id.
In this case, even if, arguendo, the survey is deemed to be incompetent, the arbitrary and capricious standard would still apply because it is not clear from the judgment or otherwise from the record that the Commission actually relied upon this evidence. When Kevin Sims testified as to his survey, the ALJ allowed the testimony in, over counsel's objection that it was hearsay, noting that the "Commission can take that into consideration." Further, in his final recommendation, the ALJ characterized this evidence as an "informal survey." It seems, then, from the record of the hearing itself, the Commission was able to recognize that the survey was hearsay, determine its probative value and relevance in accordance with Rule 32 of its Rules of Practice and Procedure, and, further, to disregard such evidence, if incompetent, when reaching its decision whether to grant the certificate. Assuming the evidence of the survey is incompetent, nothing in the record indicates that the Commission relied upon this evidence when reaching its determination whether to grant the certificate to Pontchartrain. We therefore cannot say the Commission acted arbitrarily or capriciously in arriving at its factual findings on the basis of the admission of the survey into evidence. We note there is sufficient additional evidence in the record to support the Commission's findings in this case.
As a practical matter, proof of PC & N is customarily accomplished by the applicant putting on testimony of supporting shipper witnesses to establish facts required to meet this burden. Matlack, 622 So.2d at 656. However, supporting shipper witness testimony is not the only way for an applicant to meet its burden. For example, proof of "[population growth] may be a factor to be considered in determining if public need and convenience require additional carriers in that area" even though such proof does not, of itself, show an inadequacy in the existing authorized *1091 moving service. Wisdom Moving & Storage, Inc. v. Louisiana Pub. Serv. Comm'n, 241 La. 28, 33, 127 So.2d 188, 190 (1961). The evidence adduced at Pontchartrain's hearing establishes that only one other existing carrier, Northlake, is actually located in the Covington area; the population of St. Tammany Parish has been steadily increasing during the last several years and is expected to continue to do so; and that during the peak moving season, many of the large moving companies operate at 100 percent capacity and are unable to accommodate smaller moves.
Where, as here, there are existing carriers, the burden is on the applicant to show that the public convenience and necessity require the issuance of the certificate. La. R.S. 45:164; Matlack, 622 So.2d at 655. This court has established a two-prong test to determine whether an applicant has met this burden of proof:
(A) applicant must prove that the service it offers is required by public convenience and necessity by establishing that: (1) its proposed operation will serve a useful public purpose for which there is a public need or demand; (2) existing carriers cannot and will not serve this public purpose as well as applicant; and (3) applicant's new operation can serve this public purpose without endangering or impairing the existing carriers' operations contrary to the public interest; and (B) applicant must further establish clearly that its proposed new operation will materially promote the public convenience and necessity.
Matlack, 622 So.2d at 655 (citing Louisiana Tank Truck Carriers, Inc. v. Louisiana Pub. Serv. Comm'n, 549 So.2d 850 (La.1989); and Gulf Coast Pre-Mix Trucking v. Louisiana Pub. Serv. Comm'n, 336 So.2d 849, 854 (La.1976) (collecting cases)).
While this case is close, the proof, taken from the record as a whole, furnished reasonable grounds for the Commission to find that the service Pontchartrain offers is required by public convenience and necessity. First, the evidence at the hearing demonstrated a public need or demand for the proposed operation. Public need cannot be established upon shipper testimony expressing a preference for the applicant for the new service without considering the existence of other carriers capable of fulfilling the shipper's requirements. Louisiana Tank Carriers, 549 So.2d at 854-55. The testimony of Mr. Roberts, the real estate agent, as well as the documentary evidence presented by Sims from the St. Tammany Department of Voters and Registration and the Parish Police Jury established a substantial population growth in the parish that is expected to continue. Further, the testimony of the shipper witnesses established a need in the area for more local movers, which, because they have no interstate business, can devote more time and energy to local moves within the 150 mile radius of Covington. This evidence showed more than mere shipper preference for Pontchartrain's services. Thus, from the evidence at the hearing the Commission could reasonably conclude that Pontchartrain demonstrated a public need or demand for the proposed operation.
Second, the evidence showed that existing carriers cannot and will not serve this public purpose as well as the applicant. Protestants argue that proof of a public demand left unsatisfied by existing authorized carriers can only be made through shipper testimony of specific examples of failed service. Matlack, 622 So.2d at 658. However, the type of shipper witnesses available in this case, which involves household goods, is not the same as the type of shipper witnesses available in cases involving the carriage of other products, such as waste. In other types of carrier certification cases, shipper witnesses are businesses that require transportation service on a regular basis. In household goods cases, shipper witnesses are ordinary citizens who have changed residences and who do not require transportation service on a regular basis. Thus, in cases *1092 involving carriage of household goods, where the Protestants themselves admit to having had to turn down service because of operation at near 100 to 100 percent utilization and other testimony established that existing carriers are unable or unwilling to satisfy the reasonable transportation requirements of the shipping public, it is unnecessary and overly burdensome to require shipper testimony of specific examples of failed service to establish the inadequacy of existing service. In this case, the Protestants themselves admitted that during the peak moving season they operate at near 100 to 100 percent utilization and have to turn down moves. Thus, the evidence reasonably supports the Commission's finding that Pontchartrain showed that existing carriers cannot and will not serve this public need as well as the applicant.
Third, the evidence showed that Pontchartrain's operation will not endanger the existing carriers' operation contrary to the public interest. The testimony at the hearing established that the vast majority of the Protestants' business is generated by interstate moves and that Pontchartrain will only be involved in intrastate moves. Further, Protestants currently operate at near 100 to 100 percent utilization during the peak moving season. The mere fact that the issuance of the certificate might increase competition to some extent "is a matter of no importance for, when it is shown that there is a public need for the service offered by an applicant, it cannot be said that the Commission acts arbitrarily in supplying that need." Faulk-Collier Bonded Warehouse v. Louisiana Pub. Serv. Comm'n, 236 La. 357, 360-61, 107 So.2d 668, 669 (1958). Thus, the Commission's finding that Pontchartrain showed its operation will not endanger the existing carriers' operation contrary to the public interest is reasonably supported by the evidence.
Finally, the second prong of the two-prong test was also met as the proof presented at the hearing furnished reasonable grounds for the Commission to find that Pontchartrain's proposed new operation will materially promote the public convenience and necessity. In Faulk-Collier Bonded Warehouse, 236 La. at 360-61, 107 So.2d at 669, this court held that where the evidence adduced at the hearing established that no existing carriers terminals were located within the 30-mile area covered by the order; that the population of the towns of Ferriday and Vidalia had been steadily increasing during the last five years; and that many workmen employed at a nearby paper plant had been moving to Catahoula and Concordia parishes, good ground was established for the issuance by the Commission of the certificate of public convenience and necessity for the transportation of household goods by the applicant. In Rubion Transfer & Storage Co. v. Louisiana Pub. Serv. Comm'n, 240 La. 440, 123 So.2d 880 (1960) this court held that were the evidence at the hearing showed the construction of the causeway across Lake Pontchartrain, and the ensuing growth and development of the area resulting in migration of families showed "definite need for additional means of transporting household goods" particularly were it was shown that inconvenience and trouble in moving had been experienced, the Commission had good grounds to issue a certificate of public convenience and necessity for the transportation of household goods to applicant.
However, in A-1 Moving & Storage, Inc. v. Louisiana Pub. Serv. Comm'n, 548 So.2d 934 (La.1989) this court held that the Commission's issuance of a certificate of public convenience and necessity for the transportation of household goods was arbitrary and capricious when the record in the case was totally devoid of any evidence that the operations or services of the existing carriers were inadequate in any respect. On the one hand, the applicant, Student Movers of Baton Rouge, presented only three shipper witnesses, all of whom testified the were pleased with Student Movers' work, but only one of whom *1093 anticipated the need to call on it for intrastate moving operations. Protestants, eight certified carriers, on the other hand, all testified that they were equipped to handle any intrastate move into or out of the Baton Rouge area, each had witnessed a drop in revenues in the moving industry and each had underutilized equipment.
The facts in Pontchartrain's case are more similar to the Faulk-Collier Bonded Warehouse and Rubion Transfer & Storage cases because evidence of "inconvenience and trouble in moving" was also presented along with the evidence of population growth. Pontchartrain's case is clearly distinguishable from A-1 Moving & Storage. In that case, only one of three witnesses anticipated using the applicant for future intrastate moves. Conversely, at Pontchartrain's hearing, three of its five shipper witnesses anticipated using the company for future intrastate moves. Further, the record in Pontchartrain's case is not "totally devoid" of any evidence that the operations or services of the existing carriers were inadequate in any respect as the record in A-1 Moving & Storage was. Thus, the Commission finding that Pontchartrain showed clearly that its new operation will materially promote the PC & N is reasonably supported by the evidence and not arbitrary or capricious.
Although this case is close, we cannot say from the evidence presented that the Commission acted arbitrarily or capriciously in its decision finding that Pontchartrain met the burden of showing public necessity and convenience in its application for a common carrier certificate authorizing the transportation of household goods within a 150 mile radius of Covington, Louisiana. Thus, because the Commission's determination is reasonably supported by the evidence in the record, this court must affirm. Mississippi Chemical Exp., 94-0440 at p. 8, 637 So.2d at 99 (citing Scotty's Vacuum Serv., Inc. v. Louisiana Pub. Serv. Comm'n, 450 So.2d 1303, 1304 (La.1984); B & M Trucking, 353 So.2d at 1326-27).

CONCLUSION
After reviewing the record of the evidence in this case and the law, we conclude that the Commission's finding that Pontchartrain met the burden of showing public necessity and convenience in its application for a common carrier certificate authorizing the transportation of household goods within a 150 mile radius of Covington, Louisiana was not arbitrary and capricious and is reasonably supported by the evidence. Thus, the trial court's judgment is affirmed.
AFFIRMED.
NOTES
[*] Lemmon, J., not on panel. See Rule IV, Part 2, § 3.
[1] Pontchartrain contends that because Protestants did not request oral arguments at the public hearing in front of the Commission, they waived their objection to the issuance of the certificate. However, Protestants' objection to the issuance of the certificate was read into the record at the public hearing and nothing in the Commission's rules requires a Protestant to request oral argument at the public hearing. Therefore, Pontchartrain's contention on this point lacks merit.
[2] The ALJ specifically noted that rates are not an issue in this proceeding.